I have three arguments this morning. I think you're familiar with our lighting system. Green light, you can go. Amber light gives you a couple of minutes. And when it turns red, kind of finish up your thought and be seated. We might let you complete your answer, or if there's a question from the judge, you may go on. Otherwise, you should come to an end. The first case of the morning is United States of America v. Tsolak Gevorgyan. Close? That's exactly what I wanted to say. You ready? Go for it. Good morning. May it please the Court. My name is Mark Ash, and I represent Appellant Tsolak Gevorgyan. This case is about whether the government proved, beyond a reasonable doubt, that Mr. Gevorgyan knowingly committed health care fraud and knowingly violated the Medicare anti-kickback statute. Now, a reasonable trier of fact could not have found Mr. Gevorgyan guilty of the crime of fraud because the evidence is legally and factually insufficient. Reasonable inferences of the evidence show that Mr. Gevorgyan lacked the requisite knowledge because Mr. Gevorgyan not only did not manage the clinic, but that Mr. Gevorgyan's work at the clinic was that of a mere helper. The government relies on the testimony of one witness, the self-described receptionist, Tham Tram, where she labeled and called Mr. Gevorgyan the clinic office manager. The government focuses on Tham Tram's conclusions instead of the actual duties and responsibilities that Mr. Gevorgyan had at the clinic. Mr. Gevorgyan's work at the clinic was that of a manager. Mr. Gevorgyan was that not of a manager. Mr. Gevorgyan's delivered rent checks, distributed mail such as paychecks to clinic workers. What about why couldn't the entire conviction stand on Mr. Manning's answer to the question, who provided the money to you to pay the marketers? And then he says Mike. Manning says Mike did. That seems to be the kickback case right there. Yes, that's the kickback part of it. So you're not disputing his conviction on the kickback? Well, I am disputing that for other reasons. Okay. My argument with that deals with whether he knowingly delivered the money, knowing that that money that he was delivering, like he was delivering the rent checks. Right, but Manning says he gave me the money to pay the marketers. He had a ledger. At the end of the week, we went through every single person. Actually, Manning said that he was dealing with Tam Tran, and Tam Tran had a booklet and she was noting the numbers, and he was looking at that booklet and looking at her numbers, and that he received the checks that were already printed and paid by not him, in his account, but the GoHeads accounts. But Manning says Mike paid me the money to pay the marketers. He paid. He delivered the check. That's what he says. And he said he presumably may have known about that money being for kickback. Okay. But it's, again, the problem is — It's definitely debatable. It is, but it — Once the jury makes the inference — Yes, but there was another — yes, Your Honor, but there was another problem. The evidence was not corroborated. And I bring that up here in the other part of the argument, that the evidence was not corroborated. Not only was it not corroborated, it was not corroborated because they did not show, the government did not show who filled out those checks. The government did not show as to the amounts that were filled in, that he filled them in, in his handwriting. There was not any other audio evidence, recorded evidence. There was not any other independent witness evidence. And then, not only that, Manning testified that he maintained order around the clinic, a task that the working could easily have observed him doing order, making order. He boasted about that. He boasted about him having some control over how he was getting the money from the front desk. And the person at the front desk was Tham Tran. And he stated that those checks were paid for his services. Again, that's debatable. What services were the checks actually being paid for? You're correct about that. Should I proceed? All right. What I was going to say was that, once again, we're dealing with the manager part. That's the health care fraud part. That's one set of convictions. And then there's a second set of convictions dealing with the anti-kickback statute. And the fraud part was that the government relied on his label, that being of a manager. And the task that he performed, the record shows that the task that he performed was not that of a manager. He assisted a technical person to do sleep studies. He picked up supplies as needed. But it gets much more crucial here. The tasks that he performed were not essential or necessary for the fraud to occur. And the evidence was not only not sufficient based on what the government showed for the health care fraud convictions, but also the evidence was not sufficient based on what the government did not show. The government did not show that he signed any clinic documents. They did not show that he signed any checks or had any control of any money at the clinic. They did not show that he signed off on any medical records. They did not show through audio or video evidence that he managed to operate, paid, accept money. And even more so, it did not show that he communicated by e-mail or in writing about any of the activities of the clinic to anybody inside or outside of the clinic. Did you request and get a mere presence instruction so the jury had your theory that he was there innocently even if everyone around him was colluding? I was not the trial counsel, but if I'm not mistaken, that was included in the instructions. I can't recall. I'd have to look at the record. So it's not disputed he profits from the clinic. Well, the profit— But you're just saying he didn't know. Well, I'm saying he didn't know, but I'm also going to point out about the profits. He made approximately $120,000 over a period of two and a half years. And I don't—it could be he could have made anywhere, depending upon how many hours he worked, because it was not documented how many hours he worked, anywhere between $11 and $15, $16 an hour, depending on how many hours he worked and whether he worked overtime. So I don't believe that the money, the government has showed that the money was so high and such a large quantity that it was per se obvious that it was fraud, that he profited from a fraud. But it's even more so—I want to point out that the government did not show that he had English language skills. He had medical skills. They didn't show what kind of educational background he had because he didn't even have a high school diploma. But even more so, the government not only didn't show that he was a manager, but it showed very much that Tam Tram, their witness, their one witness, that she very much performed tasks that were managerial in nature. She admitted that she, in the record, that she managed the checks of the clinic by filling in the checks that were given to her by Dr. Keeberg, the owner. I mean, was she an unindicted co-conspirator? She was not listed as a conspirator, and she was not indicted. You're correct. She was not indicted, but she wasn't listed as a conspirator. She was just a witness from what I understand. But much of her testimony shows that she was very much the person who was the manager. She had control over the front desk. She kept the appointment book. The appointment book was kept in her own handwriting. She took personal and Medicare information from the patients. So she spoke with the patients. Mr. Kevorkian didn't speak to the patients, probably because he didn't know very much English. And she assisted in some of these tasks. Mr. Kevorkian assisted her in tasks like picking up supplies for the clinic. But more importantly, she received e-mails from Dr. Keeberg with specific instructions from him. So there was indication that she communicated with him by e-mail. There was never any e-mail communications for Mr. Kevorkian. And she also in her own testimony admitted that another person, Maria Williams, not Mr. Kevorkian, was the office manager, hired her, trained her, and continued to check up on her. But the jury heard the evidence presented, and they made a decision that there was enough there beyond a reasonable doubt that he committed the crimes alleged. And we have to accept that and give them the benefit of the doubt and think that the jury reached a correct verdict. Mr. Kevorkian, do you really think that there's enough there to show that the jury reached an improper decision here? Well, not only do I believe that I do not think that they reached a proper decision, I don't think that they didn't reach a proper decision, but I get into the part as to why the jury did what they did. But that's a very good question. The next logical question is why did the jury convict Mr. Kevorkian? And that's the very last part of my brief. The short answer to your question is that I think that he did not have a fair trial. The jury convicted him based on passion and prejudice. He was tried, Mr. Kevorkian was tried with Dr. Kibbert, an American-born, educated doctor, and the attorney, Mr. Kibbert's attorney, argued throughout the trial that Armenians had caused the fraud. Dr. Kibbert supposedly was not aware of this happening. The jury looked at Mr. Kevorkian as an outsider and a foreigner. He had the assistance of interpreters. He was the only defendant of four defendants in the trial who came from a country, Armenian, ex-Soviet Republic, to the United States as a young adult. Both the government and Dr. Kibbert, more Dr. Kibbert's attorney, elicited responses from witnesses that referenced Armenians and Russians. What's your two quick record questions? When did you first make your severance request? I'm assuming it was during the trial? There was a severance request made during the trial. So there was no pretrial because all this ethnicity stuff comes up unexpectedly? It comes up later, yes, after the severance. So do you know, do you have a record cite to when you first say, hey, judge, you have to sever us? I don't have the record cite, but it was actually Dr. Kibbert's attorney who asked for a severance first.  My client, he did not disagree with the severance. He didn't request it. Maybe he didn't request it timely. So you're saying we would assess this only for plain error? That's correct because I think that as it was timely. That's fine. And the only other record question I had then was give us, it would help me to know what is the best example of ethnicity being just too prejudicial that it would rise to plain error not to sever. So you say it came up multiple times. Armenians did this. He's Armenian. What's the best example of a witness statement saying, hey, the Armenians. Well, it was an argument. It was an argument that they were criminals. It was a criminal organization. It was argued in the opening statement and it was argued in the closing statement. Right, but the court would have said to the jury, don't consider what attorneys are saying as evidence. What's the best example of evidence coming in saying Armenians are responsible? That's right. You could bring it up when you get back up for rebuttal. If you don't have it immediately, that's fine. Well, because I cite a whole series of them. Okay. And I not only — I didn't want to say one was stronger than the other. I argued in the reply brief that it was cumulative. Okay. It was one after the other, after the other, after the other. And may have been — each of them may have been equal, but I could review it and then it would be my opinion. Go on with your argument. It would be my opinion what is the best example. And I don't think that it's so much that's so important as much as I think that it's an accumulative effect that he had — that the jury had heard this over and over and over again. It was a 14-day trial. Right. And I — there was on days 2, 5, 9, 10, 13, and 14. And I cite all those references in my brief. Were the objections made whenever these comments were made? Some. Sometimes there were objections and sometimes there was not. The only remedy would have been, of course, to sever him from the trial. What happened to the objections that were made? Hmm? What happened when the objections were made? The judge had said that he did not find that there was or he did not know of any Armenian prejudice. And I think the judge was focusing — the district judge was focusing more on Armenia instead of just foreign prejudice or prejudice against foreigners in general, people who come to the United States who are recent immigrants. And I think that — Armenians enjoy, really, a remarkable economic success in this country. Well, I would say — I would probably agree with you on that. But, again, it's not so much the economic success that a group might have. It's just the fact that the person who's being tried is an outsider, is a foreigner, is not born and raised in the United States. Where was this case tried? This case was tried in Houston. Houston. In Houston. And I agree with you that Houston does not have a large — That's one of the more diverse. Yes, but Houston does not have a large Armenian population like California does. I agree with you on that. And that's what I think the judge — I think the judge didn't make it clear in the record that that's what he was basing his — I cannot find that there's Armenian prejudice. I, again — well, I have about 15 seconds. If Mr. Gvorky had been severed from the trial, then the jury would have been able to focus on the evidence of him and him alone and not on all this other evidence. Also, I pointed out in my brief about the disparity. There was a big disparity between the doctor and his activities and Mr. Gvorky. They were talking about a medical doctor that is born and educated in the United States and a recent immigrant who just didn't even finish high school, didn't have enough sufficient knowledge of English or the medical field. Okay. Thank you, Mr. Ashe. You still have five minutes remaining for rebuttal. Yes, thank you. Thank you, Your Honors. Mr. Goldman. Good morning, Your Honors. It may have pleased the Court. Ross Goldman for the United States. Let me start by answering a question of Judge Higginson. There was a mere presence instruction with respect to the conspiracy counts. It's at page 4942 of the record. Starting with the sufficiency challenges and in particular with the kickback counts, Robert Manning's testimony was by itself sufficient when viewed in the light most favorable to the verdict to sustain the kickback convictions. He testified to the way he entered the kickback operation, the way in which he assumed the role of middleman. And he testified that Mr. Gavorgian told him that his, quote, role at the clinic was going to be to, quote, pay for the patients. This is at page 25, to pay the marketers, excuse me. This is at page 2578. On page 2579, Mr. Manning testifies to his conversations with Mr. Gavorgian that evidence that Mr. Gavorgian clearly knew that the purpose of these payments was to pay ultimately for patients. Robert Manning's testimony is corroborated. It's corroborated by the multiple Medicare beneficiaries who testified that they were paid to go to the clinic. It's corroborated by the checks themselves, all of which were introduced into evidence, which were written from the account of this company, Go Have Services, which the evidence shows is a corporation that Mr. Gavorgian co-owned and served as an officer and director of. If you proved kickbacks, and I agree, Manning seems, although his testimony was pretty disjointed, constant objections for hearsay firsthand, leading questions. But if Manning does nail the kickback convictions, would that necessarily mean the scienter for the health care fraud? No, it would not necessarily. So what's the best proof that Gavorgian knowingly joined the conspiracy to commit health care fraud? Of course, Your Honor. So there's several pieces of evidence I think that are particularly salient here. One is that there was substantial fraud at the clinic. There was really no dispute about the extent of the fraud. Right. Mr. Gavorgian is there at the clinic at the site of the fraud. He is there in the — this is all record-based testimony. That's true, but that alone is mere presence, right? Even cases like Willett that I was on the panel of. It doesn't seem like we're all saying just because he was there day to day, he had to have known. No, of course not, Your Honor. But in sufficiency review, it's a compilation of pieces of evidence that considered collectively would allow — So what's the best direct evidence that he knew about, hey, their patients weren't being asked to pay copayments? So Cindy Tran testified that Mr. Gavorgian was the one who instructed her how to do patient intake and how to deal with patients at the front desk. It is an intake function, as Cindy Tran testified to, to take the Medicare beneficiaries' information, to take their paperwork. It's a fair inference, I think, from that testimony that Mr. Gavorgian would have known of these highly suspicious or did know of these highly suspicious practices. And I agree. What's your best case on inferring from his role and that he profited and his title rather than anyone actually saying Gavorgian was involved? So it's a — from that perspective, it's a circumstantial case. True. And what's the best case where we would support? Well, I think the way that — there are different cases that support different points. So Willett and Tellison from this Court I think are — clearly support the notion that proximity to the fraud and a leadership role and the entity that's being used to do the defrauding is part of the evidentiary basis. This Court's decision in Sanjar noted that paying patients is a, quote, strong indicator of health care fraud.  This Court in Sanjar also favorably cited the Fourth Circuit's decision in Bejogli which says that profiting is evidence of intent to defraud. So I think it's the collection of these facts, and we marry up all of the relevant facts with case law in our brief to show that these are things that allow a reasonable jury to have come to the determination. What were the medical services that were actually provided? That's always a hard question to answer in a fraud clinic — in a fraud case because so much of it wasn't provided. I can tell you it was ostensibly a sleep and allergy facility to treat people with sleep and allergy problems. There was ample evidence, though, that the clinic repeatedly submitted reimbursement claims for testing on patients' genitalia and rectal regions, even though multiple beneficiaries testified that they never had those tests. There was testimony in the record that it would be, of course, highly unusual for a sleep and allergy facility to conduct those kinds of tests. I think there probably was some amount of sleep tests that were done, whether or not — and there's some evidence that patients undertook these sleep tests because they were paid to go to the clinic, not because they actually had sleep problems. But that was the nature of the business. And Dr. Kieber is sort of the mastermind? Is that how you pronounce his name? Kieber. Well, he was the doctor at the clinic, and he sort of set up the — So he's convicted and then he was released pending to appeal? What happened? So what happened was he was convicted and sentenced and allowed to self-report, and he failed to appear for his self-reporting. His self-reporting. He self-reported. It just wasn't where you wanted it. Fair enough. And just to round out the circle, we had moved to dismiss Dr. Kieber's appeal on future disentitlement grounds. The Court granted that motion. I'm just curious. Did the government oppose the self-reporting? Did the government request that he be — after he was sentenced? You know, honestly, Your Honor, I don't recall. I don't recall. It may well be in our motion to dismiss — What was his illness? Dr. Kieber's or Mr. Gavorgan's? The doctor that fled. I think it was somewhere in the nature of 62 or 63 months. I'm sorry? 62 or 63 months, something like that. What's your answer on the ethnicity prejudice issue? So the claim on appeal is this anti-Armenian bias, the notion that the jury was invited to convict out of animus toward Armenians. And I think the record citations that Mr. Gavorgan points to in his brief, they don't support that. What Dr. Kieber's defense was, was I was an innocent doctor and I was duped by these other Armenians into — they were submitting these Medicare fraud payments or reimbursement claims without my knowing it. He was tying it to specific individuals at specific places. I don't think there is any fair reading of the record which suggests that there was any effort to suggest that Armenians are, as Mr. Gavorgan frames it in his opening brief, inherently dangerous or inherently criminal or as a group of people are more sensitive to this type of activity. Another point I just want to make sure the Court makes is this claim is subject to review for plain error. And even — Were there any challenges to the references to Armenians that made a trial? There were some challenges to it. There were some — at one point there was a request by Mr. Gavorgan for sort of an anti-prejudice instruction to the jury. He then subsequently affirmatively and unambiguously withdrew his request for that  There were concerns raised that if the district court were to allow Dr. Kiebert to, for example, get into discovery with respect to other Armenians in other fraud cases in the Texas area, that that might be a problem. But what there was not at any point in the trial was a request from Mr. Gavorgan to be severed on grounds of anti-Armenian bias. There was a request that the jury be instructed? There was a request at one point that the jury be instructed. Some kind of anti-prejudice instruction. What did the district court do? The district court was open to the idea. The government was not going to object to the idea. But everyone agreed to sort of reconsider it as the trial unfolded. There was another reference to it later in the trial. And then ultimately later in the trial, Mr. Gavorgan stood up and said, Your Honor, I don't want — I'm afraid this is going to call more attention to it. I don't want you to give the instruction. And so the Court gave no instruction. Now, the Court did give a sort of standard instruction at the closing instructions — this is at page 4927 — that the jury was to base its verdict, quote, solely upon the evidence without prejudice or sympathy. Not an instruction. Correct. The other point I want to make is that even were this claim preserved, it would be subject to review for abuse of discretion, and it would be running into the headwinds of all of the case law from this Court and, for example, from the Supreme Court's decision in Zafiro that strongly favors joint trials. And severance is required only if there is a specific and compelling showing of prejudice that a curative instruction could not resolve. I would just point the Court. On day 12 of trial, Mr. Gavorgan, there was an issue about — this issue arose again about this vast anti-Armenian conspiracy. And Mr. Gavorgan says, and this is at page 4521 of the record, and honestly, I don't think that at this point we've gotten to a place where I'm actually harmed by this. The district court says, I don't think so. I don't think so. Mr. Gavorgan says, so at this point, I think I'm okay. This is at day 12 of trial. There's only two days left. Mr. Gavorgan, in his answering brief, identifies something like 22 or 23 instances that he claims go to this anti-Armenian bias point. Almost all of them occur before the point in trial in which he says that he's not actually prejudiced by any of this. But you say he? Was it him or his lawyer? It was his counsel. It was his counsel. Sorry, Your Honor. And I think just the final point on the severance issue that I want to make is that the district court was alert to this. And throughout the trial was what made statements on the record that suggested both that the court was attentive to this concern and, and this comes out particularly in denying Mr. Gavorgan's new trial motion, that the court made findings on the record that it's on no basis for thinking that this jury convicted on the basis of any kind of anti-Armenian or ethnic bias, but rather that the evidence was, quote, pretty strong, that's at page 5161 of the record, and that that evidence is what supports the jury's verdict. And this will be, I think, my final point on this. Mr. Gavorgan, in his opening brief, seems to attribute this effort to loop in these other Armenians and this effort to encourage the jury to convict on bias to the government as well as to Dr. Kiebert. And I just want to make clear that the court is aware that this was not something that the government was trying to do. There are a number of references in our brief to statements in the record, both by the district court judge and by Mr. Gavorgan's own counsel, clearly stating that the government is trying hard to keep this out of the trial. And so I just, as a factual matter, I want to make sure the court is aware of that. I am happy to answer any other questions the court may have on either the sufficiency claims or the severance claim. Otherwise, we would rest on our briefs and ask that the convictions be affirmed. Okay. Thank you, Mr. Gavorgan. Thank you. Mr. Ash? Yes. To answer some of the questions, both the doctor, Kiebert, and Mr. Gavorgan got the same sentence, which was 58 months, which shows that they were treated, I think the court treated both of them equally, despite the fact that there was a large disparity of evidence between the two of them. And the other question regarding the strongest prejudice was on day 13 and on day 14, Dr. Kiebert's, and I state this in my brief, that Dr. Kiebert's attorney used the word Armenian fraudsters. And there was an objection. And the objection was sustained. And it was the testimony of Wayne Poole, a Texas Medicare fraud control agent. And Dr. Kiebert was trying to show that there was many, many different Armenians that were doing one fraud after another after another. And Dr. Kiebert's attorney was, of course, linking up GoHev, which was owned by two persons with Armenian names, to Gavorgan, who was Armenian, and that her client, Dr. Kiebert, was not aware that Armenians were doing fraud using Dr. Kiebert's identity. Also on day 14, on the closing, again, the government argued on the record 5026 that there wasn't a criminal agreement made with Armenian individuals. And that is, in closing, that's not evidence. But, again, the jury heard this very much so at the end of the trial, more so than at the beginning. But I do cite instances in my briefs throughout the trial. The district court addressed all this in denying the new trial motion. The district court said that he didn't believe that there was Armenian prejudice. In other words, I think he got the idea that — So he said he didn't think he saw prejudice here, and he said he didn't see a disparity in evidence between the two. Are those fact findings ones we would have to reverse only for clear error? I think that it should, yes, it should be reversed for clear error. But I do not believe that the judge made a finding about disparity of evidence. He made more finding that there was not any prejudice in his denial of the motion for a new trial because he was of the opinion that Armenians are not a suspect group. And I think that the judge focused more on the Armenian instead of on the fact that Mr. Gavorkian was a recent immigrant. And I do believe that there is some prejudice from some jurors regarding recent immigrants, regardless of where they came from, especially recent and young immigrants who don't know the English language and American culture as well, and they're still in the process of learning it. Well, the jurors don't know if they're Armenian. They can read the names. Yes. The names were one after the other. They got up their Armenian names. Yes, they are strange-sounding names to an English speaker. I would agree with you. There's nothing wrong with meeting with some Russians, is there? Well, there was some Russians involved in this as well. He was involved with a tech, Mr. Osterkoff, Igor Osterkoff, and he did state in the pre-sentence report that he did learn a lot of Russian in school. So I think that there... Take a glance at the MD Anderson or the Methodist Hospital or any of the medical complex roster of surgeons and see how many Armenians you see there, some of the top surgeons in this country. Yes, and Russians as well. They're proud of their names. Yes. I would agree with you that... I was just suggesting to you that the immediate inference of Armenian as being an alien in a city as diverse as Houston doesn't strike me as being overwhelming. It's not necessarily the case. It depends on how they're used at trial in part, a we-they type of notion, and I understand that, but they are worse. Anyway, I think that's... I'll leave it at that. Yes, it could have been much worse. I agree. Yes. Okay. Thank you, Mr. Ash. Thank you. You are court appointed. The court appreciates your service to the court. Thank you. We need lawyers to volunteer and take on these criminal appointments. Over 90% of all criminal cases involve appointment of a lawyer, either the public defender's office or a private lawyer. We do appreciate your service to the court. Thank you. Thank you, Your Honor.